## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

**CRIMINAL ACTION NO. 3:16-CR-00054-JHM**

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**v.**

**LAMICHAEL MCCLAIN**                                           **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant LaMichael McClain's motion to suppress evidence seized and statements made during various searches during the spring and summer of 2015. (DN 17.) This matter is now ripe for decision. For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

### I. BACKGROUND

On May 16, 2015, Louisville Metro Police Department ("LMPD") received reports of a home invasion and robbery at a residence on Magazine Street in Louisville, with possible shots fired. (Tr. Suppression Hr'g [DN 37] at 72:23–25.) After witnesses provided a description of a vehicle that may have been used by a suspect, officers located and stopped a vehicle matching that description. (*Id.* at 5:5–10, 39:24–40:9.) However, officers soon discovered that the individual driving the vehicle, Defendant LaMichael McClain, was a victim of the robbery, rather than a suspect. (*Id.* at 41:6–15.) After making this discovery, McClain was allowed to drive his own vehicle back to the Magazine Street residence, where LMPD officers were investigating the robbery. (*Id.* at 42:17.)

Through discussions with both McClain and two other individuals who had been present during the robbery, officers became aware that one male victim of the robbery was unaccounted for. (*Id.* at 5:11–13, 6:19–7:3.) Having found shell casings by the side door to the home and

aware of the prior reports of shots having been fired, LMPD officers feared that this missing victim was possibly injured inside the house and decided that a "protective sweep" must be made of the residence. (*Id.* at 8:18–20, 43:21–44:3.) However, the doors were locked, and McClain had no keys. (*Id.* at 7:19–21.) The officers made clear to McClain that they "were going in the house" regardless of the method of entry that was required. (*Id.* at 37:16–17.) McClain ultimately entered through a rear window that was unlocked with some assistance from an officer and opened the side door once inside. (*Id.* at 45:4–14.) The officers entered the residence while McClain exited the house so that they could perform the protective sweep. (*Id.* at 10:14–18.)

Officers completed the protective sweep within two minutes of entering the residence, looking only in spaces where an individual could be located. (*Id.* at 9:20–10:5, 76:18–24, 98:3–4.) This included a storage closet in the hallway near the side door. (*Id.* at 47:1–8.) No individuals were discovered in the residence. (*Id.* at 9:20–10:5.) During the protective sweep, however, the officers found drug paraphernalia and other evidence of narcotics trafficking. (*Id.* at 11:8–12.) This included a knife with suspected cocaine residue, plastic bags with suspected cocaine residue, and rolling papers in the kitchen; a large scale, money counter, and vacuum sealer in the living room; and a safe, two large suitcases, and another scale in the hall closet. (*Id.* at 98:8–24.) All of these items were allegedly unconcealed and in plain view when the officers entered the residence. (*Id.* at 11:14–17.)

After the protective sweep was completed, McClain was allowed back in the residence, and officers began seeking his assistance in accessing a surveillance system that may have recorded the earlier robbery. (*Id.* at 15:4–9.) However, the system required a password to access the data contained within it, and McClain did not know the password, as the system had been set up by his stepfather and belonged to his mother. (*Id.* at 17:6–9, 51:4–5, 187:16–20.) After

McClain's mother arrived, LMPD obtained consent from both McClain and his mother to take the surveillance system hard drive to investigate the robbery. (*Id.* at 16:12–20.) Officers recorded both McClain and his mother consenting to LMPD taking the hard drive. (*Id.*)

LMPD officers also obtained McClain's consent to search the residence following the protective sweep, as the discovery of the drug paraphernalia led the officers to "split into a multifacet[ed]" investigation of both the robbery and narcotics trafficking. (*Id.* at 18:13–18, 103:17–21.) However, McClain signed the consent-to-search form at 9:40 p.m., roughly an hour after the officers had presumably completed the protective sweep. (*Id.* at 66:7–21.) One officer did at least spend some of this time working with McClain on accessing the surveillance footage. (*Id.* at 53:22–54:5.) McClain denied ownership of the safe or knowledge of how to unlock it, and he gave verbal consent for the officers to take it. (*Id.* at 82:19–23, 83:15–21.) LMPD applied for a warrant to search the safe on May 19, 2015, which was granted and executed. (Search Warrant Aff. [DN 17-3] at 5; Tr. Suppression Hr'g [DN 37] at 83:15–21.) Cocaine and personal documents associated with McClain were found in the safe. (Tr. Suppression Hr'g [DN 37] at 84:1–5.) McClain was not arrested or charged with any offenses on May 16. (*Id.* at 19:12–14.) However, he did give officers his phone number so that they could further discuss the robbery, although no further discussions occurred. (*Id.* at 56:25–57:11.)

On June 9, 2015, McClain was stopped by an LMPD officer for reckless driving and having tinted windows. (*Id.* at 133:3–11.) After approaching McClain and requesting he exit the vehicle, McClain sped off. (*Id.* at 134:2–17.) A gold car that had been parked in front of McClain before he was stopped was registered to an individual named Kiera Bradley, and when officers contacted Bradley, it was discovered that she was in the car with McClain when he sped off from the traffic stop on June 9. (*Id.* at 133:25–134:1, 136:20–137:2.) She gave officers

McClain's phone number, which officers learned was the same number as the one given by McClain following the robbery on May 16. (*Id.* at 136:20–137:11.)

Based on the traffic incident, the evidence of narcotics trafficking discovered on May 16, and McClain's known involvement in narcotics trafficking, LMPD officers applied for and obtained a "ping" order allowing them to remotely track McClain through the GPS system in his phone. (*Id.* at 137:20–23.) This remote surveillance revealed that McClain spent significant time at an apartment on Ashby Farm Drive in southwest Louisville. (*Id.* at 138:19–23.) On July 1, officers tracked McClain to a Circle K gas station in Louisville and, upon arriving at the location, observed McClain driving a blue Chevy Silverado. (*Id.* at 140:2–8.) On July 2, officers obtained the rent roll to the apartment complex where McClain was spending time and learned that the apartment in question was leased to an individual named Kasey Taylor, who was known to officers as McClain's girlfriend. (*Id.* at 140:19–24, 166:22–23.)

After conducting further surveillance on the apartment, officers obtained a warrant to search the Ashby Farm Drive apartment on July 15, and it was executed the next day. (*Id.* at 142:19–22.) Upon searching the apartment, officers discovered a large quantity of marijuana and a handgun. (*Id.* at 170:13–19.) Meanwhile, McClain was arrested leaving a residence on Garland Avenue in Louisville on an outstanding warrant at the same time as the search warrant was being executed. (*Id.* at 142:24–143:8.) He was taken to the Ashby Farm Drive apartment, where he signed a consent form to search the blue Chevy Silverado that was parked outside the apartment and in which officers had previously observed him. (*Id.* at 171:9–25.) Inside the vehicle, officers found three firearms. (*Id.* at 146:24–147:5.)

On May 4, 2016, McClain was indicted on two counts of possession of a controlled substance with intent to distribute and one count of possession of a firearm by a convicted felon.

(DN 1.) McClain moved to suppress all evidence seized and statements made as a result of the searches of the Magazine Street residence, the safe seized from his residence, the Ashby Farm Drive apartment, and the blue Chevy Silverado. (DN 17.) An evidentiary hearing was conducted on December 22, 2016 (DN 37), and the matter is now ripe for decision.[1]

## II. DISCUSSION

### A. SEARCH OF MAGAZINE STREET RESIDENCE

### 1. ENTRY INTO RESIDENCE

McClain first contests the entry into his residence on Magazine Street and the seizure of any evidence of narcotics trafficking from the residence. He argues that there was no justification for entering his residence and seizing any evidence, and that even if any exception to the Fourth Amendment's warrant requirement permitted the officers to enter the residence, their conduct once within the residence was impermissibly intrusive. Finally, he argues that any consent given to search the premises or seize any evidence was not validly obtained.

While the Fourth Amendment typically requires law enforcement to obtain a warrant before entering an individual's home, there are a number of exceptions to the warrant requirement. *United States v. Archibald*, 589 F.3d 289, 294 (6th Cir. 2009) (quoting *United States v. United States District Court*, 407 U.S. 297, 318 (1972)). One such exception, known as the "emergency aid" exception, allows officers to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). If there is "an objectively reasonable basis for believing that a person

---

[1] The Court ordered post-hearing briefing by both sides. However, the United States failed to timely file its brief after having requested an extension of time three times. Therefore, the Court determined that the United States had forfeited the right to file any post-hearing briefs. The Court also denied McClain's motion to sustain the motion to suppress due to the United States' lack of timely response. (DN 47.)

within the house is in need of immediate aid," then officers may enter the home without a warrant. *Id.* (internal quotations and brackets omitted). While the exception is only applicable when there is "credible and reliable evidence" of the need to render emergency aid, *Nelms v. Wellington Way Apts., LLC*, 513 F. App'x 541, 546 (6th Cir. 2013), "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49 (internal quotations omitted). The burden is on the government to establish that circumstances existed to justify the entry. *United States v. Barclay*, 578 F. App'x 545, 548 (6th Cir. 2014) (citations omitted).

Here, the officers were justified in entering the Magazine Street residence under the emergency aid exception. The responding officers had received reports of an armed robbery and home invasion at the Magazine Street residence, with possible shots fired. Multiple witnesses, including McClain, informed the officers that a male victim of the armed robbery was unaccounted for. Upon arriving at the residence, shell casings were found near the side door where the robbery was said to have taken place. This evidence is sufficient proof "of a likely serious, life-threatening injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49.

First, the crimes to which officers were responding, armed robbery and home invasion, were sufficiently serious for officers to consider the need of entering the home without a warrant. *Compare Schreiber v. Moe*, 596 F.3d 323, 330 (6th Cir. 2010) (preventing physical abuse qualifies as exigent circumstance) *with Nelms*, 513 F. App'x at 546 (responding to property damage does not qualify as exigent circumstance). Second, the officers were able to confirm that shots were likely fired during the commission of the crime upon arriving at the residence, as shell casings were found near the entry way, along with what was possibly a bullet hole entering the house. (Tr. Suppression Hr'g [DN 37] at 34:22–35:2.) The Sixth Circuit has consistently

found that the presence of shots fired at a crime scene weighs in favor finding an exigent circumstance that would justify entry to render emergency aid. *See Barclay*, 578 F. App'x at 549 ("Here, the officers knew that shots had been fired"); *United States v. Huffman*, 461 F.3d 777, 779 (6th Cir. 2006) ("When the officers arrived, they observed bullet holes" after receiving a report of shots fired); *Causey v. City of Bay City*, 442 F.3d 524, 529 (6th Cir. 2006) (officers "had a report that shots had been fired from the residence"). Finally, the officers were unable to account for a victim of the crime in which shots had been fired, and the residence was the most likely place where he may have been found.

The lack of visual confirmation that the unidentified victim had been shot does not defeat the reasonable belief that an injured individual may have been inside the residence. The Sixth Circuit in *Schreiber* noted,

> It is true that this case lacks some of the more outward manifestations of violence that often support a finding of exigency. In particular, there were no signs of blood, [or] broken objects . . . But these are not prerequisites to a finding of exigency. As the Supreme Court has noted, officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception. As in *Fisher*, here it sufficed to invoke the emergency aid exception that it was reasonable to believe that [the aggressor] was about to hurt, or had already hurt, [the victim].

*Schreiber*, 596 F.3d at 331 (citations and quotations omitted). Here, police were investigating a serious crime involving gunfire and could not account for a victim. Based on the totality of evidence that the officers were aware of at the time they decided to make entry into the residence, it was objectively reasonable for the officers to believe that entry was necessary to render emergency aid.

## 2. SEIZURE OF EVIDENCE

### A. PLAIN VIEW DOCTRINE

Further, once the officers had entered the residence, they were permitted to seize some of the evidence of narcotics trafficking under the plain view doctrine. While "[w]arrantless seizures presumptively violate the Fourth Amendment . . . under certain circumstances an officer may seize evidence in plain view without a warrant." *United States v. Mathis* 738 F.3d 719, 732 (6th Cir. 2013) (citations omitted). In order for the plain-view exception to "apply to the seizure of an item, there are four factors that must be satisfied: (1) it must be in plain view, (2) its incriminating character must be immediately apparent, (3) the officer's presence in the place from where the item can be plainly seen must be lawful, and (4) the officer's access to the item must be lawful." *Barclay*, 578 F. App'x at 550 (citing *Mathis*, 738 F.3d at 732).

Beginning with the final two factors, the officers observed any evidence from a lawful vantage point, as their entry into the residence was justified under the emergency aid doctrine. The officers only looked where a person or body could be reasonably found, and McClain has not contested that a body could not have fit in the kitchen, living room, or hall closet from where the evidence was ultimately seized. *See Leonelli v. City of Kendallville*, 2008 WL 3874701, at *11 (N.D. Ind. Aug. 15, 2008) (finding no constitutional violation when exigent circumstance search was "limited to those areas of the home where a person or body could be found"). And the Sixth Circuit has acknowledged prior holdings that once "officers [enter] a residence due to exigent circumstances, they [are] entitled to seize" evidence of criminal activity that is in plain view, establishing the officers' lawful right of access to the evidence. *Huffman*, 461 F.3d at 785 (citing *United States v. Rohrig*, 98 F.3d 1506, 1525 (6th Cir. 1996)). Thus, the third and fourth factors are satisfied.

As to whether the evidence was in plain view, McClain testified that two items seized from the living room, the scale and the vacuum sealer, were not in plain view but were rather underneath the couch and in a cabinet. (Tr. Suppression Hr'g [DN 37] at 233:6–19.) The officers who conducted the protective sweep of the residence testified that these items were not concealed under a couch or within a cabinet. (*Id.* at 10:1–13, 27:20–25, 62:11–16.) After considering the credibility of each witness based on their testimony, the Court finds that the scale and the vacuum sealer were in plain view when the officers entered the residence. McClain admitted to lying to police during their investigation, raising doubts about his credibility, and multiple officers corroborated that all the evidence was found unconcealed in the residence. (*Id.* at 27:20–25, 62:11–16, 217:11–13.) Thus, the first element is met.

Lastly, the incriminating nature of the evidence seized must have been immediately apparent so as to give the officers probable cause to seize it. When determining whether probable cause is immediately apparent, the Court is to consider three factors: "(1) the nexus between the seized object and the items particularized in the warrant; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity; and (3) whether probable cause is the direct result of the executing officer's instantaneous sensory perceptions." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 554 (6th Cir. 2003) (citations omitted). As to the first factor, there was no search warrant in this case, but the officers were lawfully on the premises under the emergency aid doctrine. Their purpose in being in the residence was to search for the missing victim, not evidence of narcotics trafficking. Thus, no nexus existed at least between the officers' purpose in entering the residence and the evidence seized. Second, while there was only suspected drug residue on the knife and plastic bag, "[a]n officer may rely on his training and experience to determine whether an object in plain view is

likely narcotics," or, as in this case, associated with narcotics trafficking. *United States v. Baker*, 750 F. Supp. 2d 921, 930 (W.D. Tenn. 2010). And third, there was no manipulation of any of the evidence; the officers were able to instantaneously perceive the evidence and its alleged association with criminal activity.

While acknowledging that there is no nexus between the officers' purpose in searching the residence and the items seized, the Court finds that it was immediately apparent to the officers that all of the items seized were evidence of narcotics trafficking, with the exception of the safe. *See United States v. Blair*, 214 F.3d 690, 698 (6th Cir. 2000) (officers who observed "a clear plastic bag containing a hard off white substance" believed to be cocaine could seize the bag under plain view doctrine, as it was immediately apparent that bag was incriminating in nature); *United States v. Cardenas*, 2011 WL 4396980, at *8 (N.D. Ohio Sep. 21, 2011) ("the incriminating nature of the vacuum sealer and plastic bags was immediately apparent, as such items are often used in the packaging and transportation of drugs and drug proceeds"). Thus, the plain view doctrine applies to those items, and the motion to suppress those items seized during the search of the Magazine Street residence, with the exception of the safe, is **DENIED**.

The safe, however, was not lawfully seized under the plain view doctrine. The Sixth Circuit appears to have never addressed the issue of whether a locked safe, whose contents are unknown, is immediately apparent as evidence of a crime when that safe is found along with drug paraphernalia and other evidence of narcotics trafficking. *But see United States v. Saddler*, 498 F. App'x 524 (6th Cir. 2012) (no constitutional violation when police seized a safe located outside a home believed to be evidence of burglary without a warrant, as officers reasonably believed that evidence would be destroyed if not immediately seized). Of the courts that have addressed the issue, no consensus has developed. *E.g.*, *United States v. Guy*, 903 F.2d 1240,

1243 (9th Cir. 1990) (safe was immediately apparent as evidence of criminal activity and subject to seizure under plain view doctrine, as "presence of the safe was indicative of narcotics activity when considered with the other evidence" found near safe, including scale); *United States v. Robertson*, -- F. Supp. 3d --, 2017 WL 931615, at *20 (D. Conn. Mar. 8, 2017) ("Just seeing a safe inside a drug dealer's apartment does not give rise to probable cause to seize the safe . . . [as] the criminality of the safe was not immediately apparent"). Considering the factors listed in *Shamaeizadeh*, there was no nexus between the officers' purpose of entering the home (to render emergency aid) and the items seized. And while the safe, when viewed along with the other items found in the residence, may have given the officers an immediate *suspicion* that it contained evidence of narcotics trafficking, it did not immediately *appear* to be evidence of criminal wrongdoing. Thus, the plain view exception did not justify the seizure of the safe.

## B. CONSENT

However, even if the safe was not validly seized under the plain view doctrine, LMPD officers gained McClain's consent to seize the safe. A seizure "authorized by consent is wholly valid," so long as the government meets its "burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The consent must also not be "the result of coercion, duress, or submission to a claim of authority." *United States v. Lee*, 793 F.3d 680, 685 (6th Cir. 2015) (citations omitted).

The record indicates that McClain told officers he did not know how to get into the safe, the safe was not his but rather belonged to a friend, and that officers could take the safe with them. (Tr. Suppression Hr'g [DN 37] at 18:13–18, 82:19–83:8, 106:1–107:2.) He was not under arrest or detained when he consented to the seizure of the safe. (*Id*. at 19:12–16.) McClain testified that he originally did not consent to the taking of the safe but ultimately agreed after

being told that he would not be charged with a crime if he consented. (*Id.* at 211:7–212:11.) Based on this evidence, the government has met its burden in demonstrating that McClain's consent was freely and voluntarily given. Multiple witnesses testified that McClain's consent to the seizure of the safe was unprompted by any questioning or request to seize the safe; he simply stated that the safe was not his and that the police could take it. Even if one accepts McClain's testimony that he initially refused to consent to the seizure of the safe, that testimony indicates that he was aware that he was free to refuse to consent, a factor this Court may consider in determining voluntariness. *United States v. Watson*, 423 U.S. 411, 424 (1976).

The only troubling evidence as to the voluntariness of McClain's consent is his testimony that officers promised not to charge him with any crimes if he consented, which was corroborated by his mother who was also present at times that evening. (Tr. Suppression Hr'g [DN 37] at 189:12–15.) But according to McClain, this promise was used to induce him to sign the consent-to-search form. (*Id.* at 212:8–11.) McClain's grant of consent to search the residence, made by signing the consent form at 9:40 p.m., is different from the grant of consent McClain made to seize the safe, which was made separately when officers informed him they had found a safe after conducting the protective sweep. Thus, even if officers did promise to not charge McClain with any crimes in exchange for his signing of the consent form, the Court has already concluded that McClain consented to the seizure of the safe unprompted and with no promise made that he would not be charged. There was no environment of coercion surrounding his unprompted oral consent to the seizure of the safe that would render it involuntary. Therefore, because McClain freely and voluntarily consented to the seizure of the safe, the motion to suppress the seizure of the safe during the Magazine Street search is **DENIED**.

McClain has not specifically addressed in his briefing the surveillance system hard drive that was seized after he and his mother consented to police taking it, nor has he made any argument as to why it should be suppressed beyond the general statement that any consent given on May 16 was coerced. (Def.'s Post-Hr'g Brief [DN 48] at 3.) The officers recorded both McClain and his mother giving consent to seize the surveillance system hard drive, and there is no evidence in that audio or from the surrounding circumstances that this consent was the product of unlawful coercion. Therefore, the motion to suppress the surveillance system hard drive is **DENIED**.

### 3. SUPPRESSION OF STATEMENTS

Finally, McClain asks generally that all statements be suppressed in relation to this search. However, McClain has not made any argument that he was in custody during this search, that any interrogation took place, or that McClain was not properly Mirandized. Therefore, the motion to suppress any statements made in the course of the search of the Magazine Street residence is **DENIED**.

### B. SEARCH OF SAFE

Next, McClain seeks to suppress the evidence seized from the safe that was taken from the Magazine Street residence. The safe was searched pursuant to a warrant. McClain argues that the warrant was invalid, as it was based on the evidence found in the search of the Magazine Street residence, which was unconstitutional. (Def.'s Post-Hr'g Brief [DN 48] at 4.) However, the Court has determined that the search of the residence was constitutional, as was the seizure of the evidence of narcotics trafficking. Thus, the warrant was not based on "the fruit of a poisonous tree," as McClain alleges. McClain does not argue that the warrant otherwise lacks

probable cause.  Therefore, the motion to suppress the evidence seized from the safe is **DENIED**.

### C. SEARCH OF ASHBY FARM DRIVE APARTMENT

#### 1. PROBABLE CAUSE

McClain seeks to suppress the evidence seized from the search of the Ashby Farm Drive apartment, as the affidavit in support of the warrant lacked probable cause.  In reviewing whether an affidavit establishes probable cause, the Court must consider that

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (citing *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) (internal quotation marks and alterations omitted)).  This requires that "a nexus [exist] between the place to be searched and the evidence sought."  *Id.* at 594.

The affidavit for a search warrant was filed on July 15, 2015. (DN 17-2.)  The affidavit includes the following evidence connecting the Ashby Farm Drive apartment to McClain and evidence of narcotics trafficking: (1) McClain was a known drug dealer from the search of the Magazine Street residence, his criminal record, and further investigation into McClain; (2) police conducted surveillance on the apartment and had seen McClain entering and exiting the unit; (3) the apartment was leased to an individual known to officers as McClain's girlfriend; (4) an unidentified individual had seen heavy foot traffic around the apartment, and this individual had heard from other individuals that the breezeway in front of the apartment occasionally smelled of

marijuana; and (5) based on the training and experience of the affiant, drug traffickers will use various locations, including their girlfriend's residence, to conceal their activity. (DN 17-2.)

As to a nexus between the apartment and the evidence sought, the Sixth Circuit's recent decision in *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016), makes clear that

> a suspect's status as a drug dealer, standing alone, [does not] give rise to a fair probability that the drugs will be found in his home. Rather, we have required some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence; that is, we have required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence.

*Brown*, 828 F.3d at 383 (citations omitted). Thus, McClain's status as a known drug dealer alone is not sufficient to establish probable cause that evidence of drug trafficking would be found in his girlfriend's apartment. There is, however, other evidence that may create a nexus between the apartment and criminal activity: the statements by the unidentified individual regarding heavy foot traffic and the smell of marijuana around the apartment. The issue becomes, then, whether the statements of this individual are enough, when added onto McClain's known status as a drug dealer and his presence in the Ashby Farm Drive unit, to establish probable cause.

"When a search warrant issues based on an informant's tip, that informant's 'veracity, reliability, and basis of knowledge are all highly relevant,' but are not 'separate and independent requirements to be rigidly exacted in every case.'" *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (quoting *Gates*, 462 U.S. at 238). If the informant is a "known person, named to the magistrate, to whose reliability an officer attests with some detail, [and the informant] states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached magistrate *may* believe that evidence of a crime will be found." *United States v. Allen*, 211 F.3d 971, 976 (6th Cir. 2000) (en banc) (emphasis in original). However, "in the absence of

any indicia of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration." *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006) (ellipses and brackets omitted).

The Sixth Circuit's opinion in *Higgins* controls this case. In *Higgins*, a search warrant was issued for a known drug dealer's residence based on statements made by informants that they had bought narcotics from the defendant at that location. The court held this was insufficient to establish probable cause, as "the affidavit did not attest to the informant's reliability," and "the affidavit does not assert that the informant had been inside Higgins's apartment, that he had ever seen drugs or other evidence inside Higgins's apartment, or that he had seen any evidence of a crime other than the one that occurred when Higgins allegedly sold him drugs." *Higgins*, 557 F.3d at 381. Likewise, in this case, the affidavit for a warrant to search the Ashby Farm Drive apartment contains no information about the veracity of the unknown individual who provided the limited information that might have established a nexus between the unit and narcotics trafficking. The information contained in the affidavit in this case is even less than what was deemed insufficient in *Higgins*, as the affidavit in that case at least contained information that drug trafficking had occurred inside that apartment on one instance. In this case, there is no such evidence that the informant had been inside the unit, seen drugs inside it, or seen evidence of a crime. The affidavit in this case contains no "substantial independent police corroboration" of the claims made by the unidentified informant; therefore, those claims must be disregarded, and the affidavit establishes nothing more than the fact that McClain was a known drug dealer who had been seen going in and out of his girlfriend's apartment. This, under *Brown*, is insufficient to establish probable cause that evidence of narcotics trafficking would be found in the apartment.

## 2. GOOD FAITH EXCEPTION

However, even though the warrant to search the apartment lacked probable cause, the evidence seized may still avoid suppression under the good faith exception. Despite a warrant lacking probable cause, evidence discovered pursuant to that warrant will still be admissible so long as the executing officer relied on the warrant in good faith, and the warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984). This exception will apply if the Court "determine[s] that the affidavit contained a *minimally* sufficient nexus between the illegal activity and the place to be searched," a less demanding standard than the "substantial basis" requirement for a finding of probable cause. *United States v. West*, 520 F.3d 604, 610 (6th Cir. 2008) (emphasis added).

Looking again at *Higgins*, the court found that the evidence was admissible, as the warrant was not "so obviously deficient that official reliance on it was objectively unreasonable." *Higgins*, 557 F.3d at 391. However, the affidavit in that case contained information from an informant that a drug transaction had taken place at that residence, whereas here the affidavit contains no such information. Further, there are no indicia of reliability regarding the informant in this case. In *Higgins*, the informant was known to the magistrate and, by telling officers that he had purchased drugs at the residence, was admitting to criminal activity, which the court stated was indicative that the informant was being truthful. *Id.* at 389–91. But in this case, the magistrate was not provided the identity of the informant, who wished to remain anonymous, and there are no other circumstances surrounding this information that would indicate that the informant was being truthful. Thus, reliance on the affidavit in this case was not as reasonable as it was in *Higgins*.

Further, in *United States v. Soto*, 794 F.3d 635, 646–67 (6th Cir. 2015), the Sixth Circuit found the good faith exception applicable when the affidavit contained specific information that an informant had been in a residence to purchase drugs and had seen cocaine and weapons while in the residence. The information in the affidavit in this case falls short of that, as there is no evidence in the affidavit of an actual drug transaction taking place at the Ashby Farm Drive apartment or drugs actually being seen within the unit. And in *United States v. Buffer*, 529 F. App'x 482, 485–87 (6th Cir. 2013), the court found that the good faith exception did not apply to a warrant that merely reported a number of short trips by visitors to the residence, similar to the foot traffic evidence in this case, and that one of the visitors had a small amount of marijuana on him after leaving. That determination is relevant to the statement by the informant, already diminished by its double-hearsay status and the unknown identity of either the declarant or the informant, that the breezeway smelled of marijuana, as even the known presence of drugs around the residence to be searched is not sufficient for the good faith exception to apply.

Taking these cases together, the good faith exception does not apply to the present case. The cases indicate that there must be some independent verification by law enforcement in the affidavit that drug activity, either in the form of sales or storage, is taking place at the residence to be searched for the good faith exception to apply. Here, the only information in the affidavit was that there was unusual foot traffic around the unit and that it smelled of marijuana in the breezeway outside the unit, information that came from unknown sources and was not verified by law enforcement. Thus, the good faith exception does not apply, and the evidence seized from the search of the unit should be suppressed. Therefore, McClain's motion to suppress the marijuana and firearm found inside the Ashby Farm Drive apartment is **GRANTED**.

### 3. SUPPRESSION OF STATEMENTS

McClain also seeks to suppress any statements he made in relation to this search. McClain was arrested on a state-court issued warrant at the same time that the search of the Ashby Farm Drive apartment was taking place. (Tr. Suppression Hr'g [DN 37] at 142:24–143:8.) He was first taken to LMPD's Third Division headquarters, and from there he was transported to the Ashby Farm Drive apartment, where he remained while officers completed their search of the apartment and eventually searched the blue Chevy Silverado parked outside. (*Id.* at 152:22–153:10.) McClain seeks to have all of his statements following his arrest suppressed pursuant to the Fifth Amendment's protection against self-incrimination.

Under the Fifth Amendment, no statement by a criminal defendant may be used against him if that statement "stem[s] from custodial interrogation of the defendant[,] unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Once an individual has been taken into custody, "[h]e must be warned prior to any questioning" of the four core *Miranda* warnings pertaining to silence and representation. *Id.* at 479. Any statements made in violation of *Miranda* may not be used in the prosecution's case in chief. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). Thus, the Court must look to (1) whether McClain was in custody, (2) whether he made any statements while in custody, (3) whether these statements were prompted by an interrogation, and if so, (4) whether the interrogation was preceded by proper Miranda warnings.

*Miranda* itself states that once an individual is arrested, the custodial prong of the *Miranda* analysis has been satisfied. *Miranda*, 384 U.S. at 444 ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody . . ."). Thus, McClain was in custody following his arrest on July 16 while exiting the

residence on Garland Avenue. The evidence also indicates that McClain made statements to officers while inside the Ashby Farm Drive apartment and after leaving the apartment to go to the jail, but not during the drive from the Third Division headquarters to Ashby Farm Drive. (Tr. Suppression Hr'g [DN 37] at 148:6–12, 159:16–21, 169:12–13.) And finally, the record indicates that McClain was first Mirandized when he arrived at the Ashby Farm Drive apartment. The officers present at the Ashby Farm Drive apartment read McClain his Miranda rights, and there is no reason to believe that he did not understand these warnings. Further, there is no evidence that McClain unequivocally invoked his right to remain silent, as he must have for his invocation to be effective. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). The government has submitted sufficient evidence that McClain's waiver of his right to silence, as made through his statements to the officers, was made knowingly and voluntarily, as is their burden. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (the government must establish waiver of Miranda rights by a preponderance of the evidence). Witnesses for the government testified that McClain was asking questions of the officers at the apartment in an attempt to gather information as to what the officers were doing, and that throughout he was "casually talkative." (Tr. Suppression Hr'g [DN 37] at 169:5–13.)

Therefore, the Court finds that McClain was properly Mirandized at the apartment, and that any statements made by McClain post-Miranda were made voluntarily and with knowledge of his right to remain silent. Thus, the motion to suppress any statements made in relation to the search of the Ashby Farm Drive apartment is **DENIED**.

### D. SEARCH OF TRUCK

Finally, McClain seeks to suppress the evidence seized from the search of the blue Chevy Silverado parked outside the Ashby Farm Drive apartment. McClain argues that any consent he

gave to search the truck was the product of coercion. Again, an individual may waive their Fourth Amendment rights and consent to a search of their property so long as that consent is "freely and voluntarily given," *Schneckloth*, 412 U.S. at 222, and is not "the result of coercion, duress, or submission to a claim of authority." *Lee*, 793 F.3d at 685.

An officer testified that they began working on an affidavit for a search warrant for the truck when McClain, who was under arrest and handcuffed while seated on a couch in the apartment, asked what the officer was doing. (Tr. Suppression Hr'g [DN 37] at 170:23–171:4.) The officer told him that he was preparing an affidavit for a search warrant for the truck, and McClain then asked how the search warrant process worked. (*Id.* at 171:5–8.) After hearing the officer's explanation, McClain reportedly said that "you don't have to do that" and indicated that he wanted to consent to a search of the truck. (*Id.* at 171:9–12.) McClain ultimately signed a consent to search form for the truck, where three firearms were recovered. (*Id.* at 172:11–13, 174:8.) McClain did not testify that he never consented, but he did say that officers told him they were going to obtain a search warrant if he did not consent. (*Id.* at 216:5–6.)

Based on this evidence, the government has established that McClain freely and voluntarily consented to the search of the truck. While McClain was in custody at the time he gave consent, "[c]onsent [is] not invalidated simply because [a defendant is] in custody at the time he gave it." *United States v. Burns*, 298 F.3d 523, 541 (6th Cir. 2002) (quotations and citations omitted). Further, "[n]otifying a person that a warrant can be obtained does not render consent involuntary unless the threat to obtain a warrant is baseless." *United States v. Watson*, 117 F.3d 1421, at *3 (6th Cir. 1997) (Table). The officer testified that McClain only consented after he began writing an affidavit for a search warrant for the truck, indicating that he intended to obtain such a warrant. There are no other indicia of coercion that would taint McClain's

otherwise free and voluntarily consent. Therefore, the motion to suppress the search of the truck is **DENIED**.

### III. Conclusion

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant LaMichael McClain's motion to suppress is **GRANTED IN PART** and **DENIED IN PART**.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

April 12, 2017

cc: counsel of record